**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BROADRIDGE FINANCIAL SOLUTIONS, INC., | ) | |
| | ) | |
| Plaintiff and Counterclaim-Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:10-cv-00075-SD |
| | ) | |
| INVESHARE, INC., | ) | |
| | ) | |
| Defendant and Counterclaim-Plaintiff. | ) | |

**INVESHARE, INC.'S RESPONSE TO BROADRIDGE FINANCIAL
SOLUTIONS, INC.'S CLAIM CONSTRUCTION BRIEF**

Dated:  April 25, 2011

Richard K. Herrmann (I.D. #405)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
rherrmann@morrisjames.com

David K. Callahan, P.C. (*pro hac vice*)
Adam J. Gill  (*pro hac vice*)
Serena J. Pruitt  (*pro hac vice*)
Elizabeth A. Nemo  (*pro hac vice*)
Vishesh Narayen (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 N. LaSalle St.
Chicago, IL 60654
(312) 862-2000
david.callahan@kirkland.com
adam.gill@kirkland.com
serena.pruitt@kirkland.com
elizabeth.nemo@kirkland.com
vishesh.narayen@kirkland.com

*Attorneys for Defendant and Counterclaim-Plaintiff Inveshare, Inc.*

# TABLE OF CONTENTS

Page

1. INTRODUCTION ..................................................................................................1

2. THE CLAIMED INVENTION...............................................................................1

3. LEGAL STANDARDS FOR CLAIM CONSTRUCTION................................................2

4. CONSTRUCTION OF CLAIM TERMS ...........................................................................4

    (a) Disputed Terms From Independent Claims ..................................................5

        (i) "Solicitation" Terms:  "Electronic Solicitation, " "Solicitation Content" and "Electronic Solicitation Message That Provides Shareholder Access to a Solicitation Content" ............................................5

        (ii) "authorized party" and "authorized shareholders" ...................................15

        (iii) "tagging" ...................................................................................................17

        (iv) "a component" ...........................................................................................19

        (v) "a component for tagging the electronic solicitation message to validate that a shareholder is authorized to view the solicitation content" ...............................................................................................20

        (vi) "electronic messaging" ..............................................................................22

    (b) Dependent Claim Terms ...........................................................................23

        (i) "validating that each shareholder receiving the notification is authorized to view the solicitation content"...............................................23

        (ii) "a proxy platform" ......................................................................................24

5. CONCLUSION.....................................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**Page**

### Cases

*3M Innovative Properties Co. v. Louis M. Gerson Co., Inc.*,
   2010 WL 4106712 (D. Minn. Oct. 12, 2010)............................................................ 13

*Alcohol Monitoring Systems, Inc. v. Actsoft, Inc.*,
   No. 2010-1250, 2011 WL 201494 (Fed. Cir. Jan. 24, 2011) ...................................... 5

*Altiris, Inc. v. Symantec Corp.*,
   318 F.3d 1363 (Fed. Cir. 2003) ................................................................................ 23

*American Medical Sytems, Inc. v. Biolitec, Inc.*,
   618 F.3d 1354 (Fed. Cir. 2010) .................................................................................. 5

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003) ................................................................................ 11

*CCS Fitness, Inc. v. Brunswick Corp.*,
   288 F.3d 1359 (Fed. Cir. 2002) ........................................................................ passim

*Desper Products, Inc. v. QSound Labs, Inc.*,
   157 F.3d 1325 (Fed. Cir. 1998) .................................................................................. 7

*Ecolab, Inc. v. FMC Corp.*,
   569 F.3d 1335 (Fed. Cir. 2009) .................................................................................. 8

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
   607 F.3d 776 (Fed. Cir. 2010) .................................................................................. 12

*Hakim v. Cannon Avent Group, PLC*,
   479 F.3d 1313 (Fed. Cir. 2007) .......................................................................... 13, 14

*Heuft Systemtechnik GMBH v. Industrial Dynamics Co., Ltd.*,
   282 F. App'x 836 (Fed. Cir. 2008) ..................................................................... 13, 14

*Karlin Technology Inc. v. Surgical Dynamics, Inc.*,
   177 F.3d 968 (Fed. Cir. 1999) .................................................................................. 21

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) .................................................................................... 4

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) ...................................................................................... 3

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
 579 F.3d 1363 (Fed. Cir. 2009) ................................................................................. 3, 8

*Paragon Solutions, LLC v. Timex Corp.*,
 566 F.3d 1075 (Fed. Cir. 2009) ................................................................................ 21

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) ......................................................................... passim

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*,
 318 F.3d 1143 (Fed. Cir. 2003) .................................................................................. 7

*ResQNet.com, Inc. v. Lansa, Inc.*,
 346 F.3d 1374 (Fed. Cir. 2003) ................................................................................ 13

*Ring & Pinion Service, Inc. v. ARB Corp. Ltd.*,
 2011 WL 646917 (Fed. Cir. Feb. 18, 2011) ...................................................... 17, 22

*Saunders Group, Inc. v. Comfortrac, Inc.*,
 492 F.3d 1326 (Fed. Cir. 2007) ................................................................................ 14

*Teleflex, Inc. v. Ficosa North America Corp.*,
 299 F.3d 1313 (Fed. Cir. 2002) .................................................................................. 4

*Toro Co. v. White Consolidated Industries, Inc.*,
 199 F.3d 1295 (Fed. Cir. 1999) ................................................................................ 25

*TurboCare Division of Demag Delaval Turbomachinery Corp. v. General Electric Co.*,
 264 F.3d 1111 (Fed. Cir. 2001) ................................................................................ 15

*United States Surgical Corp. v. Ethicon, Inc.*,
 103 F.3d 1554 (Fed. Cir. 1997) .................................................................................. 4

*Ventana Medical Systems, Inc. v. Biogenex Laboratories, Inc.*,
 473 F.3d 1173 (Fed. Cir. 2006) ................................................................................ 12

*Vitronics Corp. v. Conceptronic, Inc.*,
 90 F.3d 1576 (Fed. Cir. 1996) .............................................................................. 3, 11

*White v. Dunbar*,
 119 U.S. 47 (1886) ..................................................................................................... 1

## 1.    INTRODUCTION

The words of a patent's claims define its metes and bounds.  Courts may only deviate from the plain meaning of these words in a limited number of specifically-defined circumstances. Broadridge's proposed constructions selectively insert limitations into the claims from the specification and prosecution history in an attempt to support Broadridge's invalidity and noninfringement arguments, instead of relying on the claim language itself and the established rules of claim construction.  The Supreme Court rejected this approach long ago:

> Some persons seem to suppose that a claim in a patent is like a nose of wax, which may be turned and twisted in any direction, by merely referring to the specification, so as to make it include something more than, or something different from, what its words express. The context may, undoubtedly, be resorted to, and often is resorted to, for the purpose of better understanding the meaning of the claim; but not for the purpose of changing it, and making it different from what it is. The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.

*White v. Dunbar*, 119 U.S. 47, 51–52, 7 S. Ct. 72, 74–75, 30 L. Ed. 303, 305 (1886).

Broadridge's proposed claim constructions do not follow the framework the Federal Circuit has established, and this Court should reject them.  By contrast, Inveshare's constructions are consistent with the plain meaning of the claim terms and, in the few instances in which deviation is warranted, faithfully adhere to the rules of claim construction.

## 2.    THE CLAIMED INVENTION

Public companies in the United States submit certain issues to votes by their shareholders or bondholders.  The patent-in-suit, U.S. Patent No. 7,475,817 (the "'817 Patent") relates to a system and method that allows parties interested in the outcome to attempt to persuade voters to vote a certain way, a practice known as "soliciting votes":

> The present invention relates generally to the ***solicitation of votes*** from shareholders, bondholders, and others having a stake in governing corporate or

> mutual fund affairs. More particularly, the present invention pertains to methods
> and systems for communicating directly with shareholders and other stakeholders
> [sic] to **solicit votes** regarding particular corporate affairs, including matters of
> corporate governance and securities transactions.

Ex. 1 ('817 Patent) at 1:14–22.[1,2]   Issuers wishing to solicit votes hired agents known as

"solicitors" to contact the company's voters, typically by mail or telephone, to deliver the

solicitation message.  *Id.* at 1:23–26.  Alternatively, issuers placed messages on their websites or

used mass media to reach and affect voters.  *Id.* at 1:27–34.

There is a different kind of solicitation, known as "proxy solicitation," in the field of

corporate governance and shareholder voting.  "Proxy solicitation" refers to obtaining the

authority to vote on behalf of a security holder.  *See* 17 CFR 240.14a.  Proxy solicitation is

heavily regulated by the U.S. Securities and Exchange Commission and requires the disclosure

of specific materials ("proxy materials").  *Id.*  Exhibit 2 to this Response contains a table listing

some of the differences between the solicitation of votes and proxy solicitation.  The '817 Patent

relates to anonymous electronic notification and delivery of the content of solicitations for votes

("solicitation content") using a "proxy voting platform" that protects investors' anonymity.

Ex. 1 ('817 Patent) at Fig. 4.

### 3.   LEGAL STANDARDS FOR CLAIM CONSTRUCTION

As Broadridge acknowledges in its opening brief, the claims, not the written description,

define the scope of a patent.  D.I. 34 at 5 (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005)).  Notwithstanding the supremacy of claim language, claims are read in light of

the specification, subject to the principles discussed below.  *Markman v. Westview Instruments,*

*Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995).

---

[1]  All exhibits cited herein are exhibits to the Declaration of Elizabeth A. Nemo In Support Of
   Inveshare, Inc.'s Response To Broadridge Financial Solutions, Inc.'s Claim Construction
   Brief.
[2]  Unless otherwise indicated, all emphases herein are added.

There is a "'heavy presumption' that a claim term carries its ordinary and customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). The ordinary and customary meaning of a claim term is defined as "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *See Phillips*, 415 F.3d at 1312–13. The "heavy presumption" of giving a claim term its ordinary and customary meaning can ***only*** be overcome in the following four situations:

(i)     where the patentee expressly defined a claim term in either the specification or the prosecution history;

(ii)    where the intrinsic record (i.e., the patent and its prosecution history) shows that the patentee expressly disclaimed the scope of an ordinary definition;

(iii)   where the term chosen by the patentee has no ordinary meaning and so "deprive[s] the claim of clarity as to require resort to the other intrinsic evidence for a definite meaning"; or

(iv)    where the patentee used means-plus-function format (that is, the means to accomplish a function is described in the claims, but the structure for the means is recited in the specification).

*See CCS Fitness*, 288 F.3d at 1366–67. Overcoming the "heavy presumption" of ordinary meaning requires a "clear and unmistakable" intent to depart from ordinary meaning or disclaim claim scope. *See, e.g., Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1377 (Fed. Cir. 2009) ("In determining whether there has been a clear and unmistakable surrender of subject matter, the prosecution history must be examined as a whole.").

Claims must be read in view of the specification, of which they are a part. *Markman*, 52 F.3d at 979. Apart from the claim language itself, the patent specification is the "single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). However, neither the patent specification nor the prosecution history may alter the plain and ordinary meaning of claim language absent one of the four reasons set forth above. *See CCS Fitness*, 288 F.3d at 1366

(accused infringer may not narrow claim term's ordinary meaning "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history"); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'") (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)).   The Federal Circuit has called attempts to import limitations from the specification into the claims "one of the cardinal sins of patent law."  *See Phillips*, 415 F.3d at 1320.

Not all disputed terms require construction.  Where the proper scope and meaning of a particular claim term is clear and understandable to the jury without explanation, no claim construction is necessary and none should be given.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (holding that claim construction is required only "when the meaning or scope of the technical terms and words of art is unclear and in dispute and requires resolution to determine" the issue before the court).

### 4.        CONSTRUCTION OF CLAIM TERMS

Inveshare contends that Broadridge's Electronic Shareholder Communication Platform and/or portions thereof, including but not limited to the Virtual Shareholder Meeting and Investor Network functionalities, infringe claims 1–3, 5–23, and 25–43 of the '817 Patent. Claims 1, 10, 18, 25 and 35 are independent claims; claims 2–9, 11–17, 19–23, 26–34 and 36–43 are dependent claims.  Because it is important to read and interpret the claim terms in the context of the claim language, Inveshare addresses the disputed terms in their order of appearance in the independent claims, followed by terms that appear only in dependent claims.  For the Court's convenience, Inveshare has included independent claims 1 and 10 of the '817 Patent in Exhibit 3

to this Response, emphasizing the terms at issue in italics, and indicating parenthetically the section of the briefs in which they are addressed.

### (a)   *Disputed Terms From Independent Claims*

#### (i)   "SOLICITATION" TERMS: "ELECTRONIC SOLICITATION," "SOLICITATION CONTENT" AND "ELECTRONIC SOLICITATION MESSAGE THAT PROVIDES SHAREHOLDER ACCESS TO A SOLICITATION CONTENT"

##### (1)   *"Electronic Solicitation"*

| Inveshare | Broadridge |
|---|---|
| electronic communication, other than initially disseminated disclosure documents such as annual reports and proxy statements, about an event to affect the outcome of voting on a corporate event | electronic communication about a corporate event to affect the outcome of voting on the event |

The parties agree that an "electronic solicitation" is an electronic communication to affect the outcome of voting on a corporate event. Broadridge, however, seeks to define the term to include regulated disclosure documents such as annual reports and proxy materials, which is contrary to the specification and prosecution history.[3]

The parties appear to agree that the term "electronic solicitation" did not have a specific meaning to a person having ordinary skill in the art of the '817 patent ("POSITA") at the time it was filed. Accordingly, reference to the intrinsic evidence (*i.e.*, the specification and prosecution history) is warranted to define the term. *CCS Fitness*, 288 F.3d at 1366–67. The specification teaches that "electronic solicitation" is an expansion of the traditional solicitation of votes. Ex. 1 ('817 Patent) at 1:14–15 ("The present invention relates generally to the solicitation of votes. .

---

[3] Broadridge has not presented any argument or evidence to rebut the presumption that the preamble language does not limit claim scope. *Alcohol Monitoring Sys., Inc. v. Actsoft, Inc.*, No. 2010-1250, 2011 WL 201494, at *4 (Fed. Cir. Jan. 24, 2011) ("Generally, a preamble does not limit the scope of claims unless 'it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim.'") (quoting *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010)).

."); *see also id.* at 1:22–48, 1:66–2:2.  At the time that the '817 Patent was filed, a POSITA would have known the difference between solicitation of votes and proxy solicitation, and that the solicitation described in the '817 patent was not proxy solicitation.  The '817 Patent specification also states that corporations, "*less frequently*" than hiring solicitors, may post "solicitation information" on their corporate websites.  *Id.* at 1:27–30.  This is further evidence that the '817 Patent does not consider required disclosures such as annual reports and proxy materials (which are often required to be posted online) to be "solicitation" information.

To remove any doubt, the applicant confirmed during the prosecution of United States Patent No. 7,207,487 (the "'487 Patent") that the "electronic solicitation" of the '817 Patent excludes proxy materials.[4]  For example, the applicant distinguished its invention over the *Purcell* prior art reference in order to overcome the examiner's rejection, by stating that "*Purcell teaches online delivery of investor documents* and tabulation and processing of investor instructions (Abstract)" and that in *Purcell*,

> [w]ith regard to OBOs, the issuers and other interested parties have been unable to communicate with these individuals because of their status, preventing these voters from receiving valuable information *not provided in the disclosure material (e.g., proxy statement and annual reports) as taught by Purcell*. Furthermore, *Purcell does not teach enabling the voter to consider additional data not described in the shareholder electronic documents disseminated initially*.

Ex. 4 ('487 Patent app., 12/21/06 Office Action Resp.) at 11.[5]  The patentee again distinguished the *Purcell* reference, as well as the *Parmasad* reference, in a later submission:

---

[4] The '817 Patent is a continuation of the '487 Patent.  "A continuation is a second application for the same invention claimed in a prior nonprovisional application and filed before the original prior application becomes abandoned or patented."  MPEP 201.07.

[5] Broadridge's argument that the applicant's statements during prosecution should be disregarded because they are "simply a discussion of a feature in *Purcell*" that was "unrelated to patentability" is factually incorrect and legally inapposite.  The quoted remarks were made to distinguish the invention from the prior art.  In any event, Inveshare does not cite the prosecution history to establish "clear and unmistakable disclaimer," but as evidence

> Similar to the teachings of *Purcell, Parmasad, et al.* **is concerned with delivery of legally required disclosure materials** and the mechanism of voting of proxies. **The present invention is directed to a method to send persuasive messages with the intent to sway a vote** while protecting the voter who chooses to remain anonymous to the company. **Another difference** between the present invention and Parmasad's teachings . . ."

Ex. 5 ('487 Patent app., 1/26/07 Arguments Regarding New Reference) at 3.   Accordingly, the

applicant distinguished the prior art's provision of "legally required disclosure materials," such

as annual reports and proxy solicitations, from the invention's "persuasive messages with the

intent to sway a vote."   The Court should therefore reject Broadridge's attempt to include such

materials in this claim term.

### (2)    *"Solicitation Content"*

| Inveshare | Broadridge |
|---|---|
| electronic text, audio or video content, other than initially disseminated disclosure documents such as annual reports and proxy statements, about an event, for affecting the outcome of voting on a corporate event | text, audio or video or other corporate communication from a corporation or mutual fund company, or agent acting on their behalf but not content received while participating in an online electronic meeting |

"Solicitation content," in the simplest terms, is the content of an "electronic solicitation."[6]

Broadridge, however, improperly seeks to add the phrase "but not content received while

participating in an online electronic meeting," which does not appear in the '817 Patent.

---

confirming Inveshare's interpretation of the specification and the understanding of one of skill in the art regarding the meaning of a claim term that does not have plain and ordinary meaning. *See Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1149 (Fed. Cir. 2003) ("the statements [in the prosecution history] may offer interpretive assistance to the court in construing a particular claim."); *Desper Products, Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1336-37 (Fed. Cir. 1998) ("Prosecution history is an important source of intrinsic evidence in interpreting claims because it is a contemporaneous exchange between the applicant and the examiner.").

[6] Each party's definition of this term includes its respective definition of "electronic solicitation."   Inveshare incorporates its arguments regarding "electronic solicitation" by reference.

The specification defines "solicitation content" as "[t]ext, audio, video or other corporate communication from a corporation or mutual fund company, or agent acting on their behalf." Ex. 1 ('817 Patent) at 5:15–18. And while the purpose of the invention is related to shareholder meetings, neither this definition, nor the specification's discussion of solicitation content exclude information presented in meetings from "solicitation content." *See id.* at 4:15–24. For example, the specification describes the "present invention" as:

> [d]irected to a business process using electronic means, to include multiple current and evolving Internet technologies, to provide and disseminate solicitation information on behalf of corporate stock and bond issuers (foreign or domestic) or dissident shareholders for the purpose of affecting the outcome of voting on corporate events, be it proxy voting for annual meetings, special meetings. . .

*Id.* at 1:66–2:9. The specification also states that "[t]he message tagging module 24 tags each message with issuer and meeting identifiers." *Id.* at 7:54–55.

Broadridge argues, based on a mischaracterization of the '487 and '817 Patents' prosecution histories, that the patentee disclaimed content provided in an online meeting. Broadridge cribs statements to argue that online meetings ***of any kind*** cannot infringe the patent. D.I. 34 at 15–16. The prosecution histories, when properly viewed in their entirety, show that the applicant merely argued that the claimed invention is more than simply conducting a meeting online; that the claims involve additional features, such as the anonymous distribution of solicitation information and the optional ability to provide that information after it is initially distributed. As discussed below, such statements do not support the universal disclaimer that Broadridge seeks. *See Martek Biosciences Corp.*, 579 F.3d at 1377 ("In determining whether there has been a clear and unmistakable surrender of subject matter, the prosecution history must be examined as a whole."); *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009)

8

("Even if an isolated statement appears to disclaim subject matter, the prosecution history as a whole may demonstrate that the patentee committed no clear and unmistakable disclaimer.").

In distinguishing the *Purcell* reference during prosecution of the '487 Patent, the applicant made the following remarks (which Broadridge ignores):

> "In contrast to the teachings of *Purcell*, claims 1, 12 and 19, as amended, provided for the confidentiality of all voters.   The invention enables voters to **view the solicitation information anonymously** to protect their identities from the issuer or authorized party."

Ex. 4 ('487 Patent app., 12/21/06 Office Action Resp.) at 11.   In another section of the same office action response (also ignored by Broadridge), the applicant similarly explains:

> In contrast, the description in Para. 44 of *Purcell* refers to voter **participation at an annual meeting via streaming video**. **This is quite different from enabling a viewer to view anonymously a video or audio message from the issuer** in which a corporate executive explains a proposal or issue and articulates why the voters should take a certain position on the issue or proposal with their votes. **This claimed feature ensures voter confidentiality. Streaming the annual meeting to online voters does not protect the privacy of the voters.**

*Id.* at 12–13.   These statements precede and set the proper context for the later statement, on which Broadridge relies, that "[t]he present invention does not claim participation and voting at annual meetings that are conducted online.   In contrast to both *Purcell* and *Mitchell, et al.*, the **claimed invention enables the voter to view solicitation content anonymously** at any time. . ." *Id.* at 14.

The applicant did **not** claim that it is impossible for information provided at annual meetings to be "solicitation content."   Rather, the applicant stated that simply streaming an annual meeting **alone** (*e.g.*, without anonymity and other claimed features provided by the proxy voting platform) is not the invention.   Along these same lines, the applicant stated as follows while distinguishing the *Mitchell* reference:

> "Mitchell, et al. is not relevant to the claimed invention ***since it relates only to conducting an electronic meeting and voting*** securely over the network that is established. The present invention does not claim ***participation and voting*** at annual meetings that are conducted online. In contrast to both Purcell and Mitchell, et al., ***the claimed invention enables the voter to view solicitation content anonymously*** at any time, such as the period of time between electronic delivery of documents to voters as taught by Purcell and the participation in an online meeting at which the voters can vote their shares as taught by Mitchell, et al."

*Id.* at 13.   Similarly, the applicant explained to the PTO during prosecution of the '817 Patent that the invention of *Ward, et al.* is directed at voting in an online meeting.  *See* Ex. 6 ('817 Patent app., 6/30/08 Office Action Resp.) at 17.  In contrast, as the applicant told the PTO, "the claimed invention does not limit the authorized shareholder's ability to ***access and view solicitation content anonymously*** at any time that it is available on the [ESSP's] platform." *Id; see also id.* at 18 ("There is no teaching of ***accessing and viewing solicitation content anonymously*** by authorized shareholders in *Ward, et al.*").  Thus, the applicant ***again*** distinguished the invention from the prior art on the grounds that the invention requires more than the mere placement of a meeting online or voting in such a meeting, ***not*** because all online meetings are excluded from satisfying the "solicitation content" limitation.

When considered in their entirety, rather than as the isolated snippets on which Broadridge relies, the prosecution histories of the '817 and '487 Patents do not contain a clear and unambiguous disclaimer that "solicitation content" can never be received during a meeting. Accordingly, this Court should adopt Inveshare's construction.

### (3)     "Electronic Solicitation Message That Provides Shareholder Access to a Solicitation Content"

| Inveshare | Broadridge |
| --- | --- |
| a message regarding an electronic solicitation, that is able to provide shareholders with access to an electronic solicitation | Broadridge defines the term "electronic solicitation message," as "an electronic solicitation message that includes an electronic proxy ballot" |

10

As an initial matter, Broadridge's proposed construction is problematic because it is circular, defining an "electronic solicitation message" as "an electronic solicitation message that includes . . . ." Broadridge's construction is thus nothing more than an attempt to add more words to what Broadridge admits is readily understandable claim language.

The issue, then, is whether a limitation from a claim in the parent '487 Patent application—requiring a message to contain an electronic proxy ballot—should be read into claims in the '817 Patent that do not contain that limitation. Consistent with Inveshare's proposed construction, the '817 Patent specification and claim language teach that the "electronic solicitation message" need only provide access to solicitation content. *See, e.g.*, Ex. 1 ('817 Patent) at 2:48–58 ("The method includes receiving an electronic solicitation message that provides shareholder access to a solicitation content. . ."). In fact, in a preferred embodiment of the '817 Patent, the electronic solicitation message does ***not*** include a proxy ballot or solicitation content. Instead, the ballot is accessed by first clicking on one link to access solicitation content, and then on another link to access the proxy ballot:

> Preferably, the message will contain a link to a solicitation message as indicated on the Meeting List display 70 of FIG. 7. The user can also select the name of the "Issuer" 74 on the Meeting List display 70 of FIG 7, which will then take the user to the electronic ballot page for that particular meeting.

*Id.* at 8:8–13. Broadridge's proposed construction would result in this preferred embodiment being eliminated, and therefore this Court should reject it. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1349 (Fed. Cir. 2003) ("A claim interpretation that reads out a preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'") (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)).

Broadridge does not argue, nor could it, that the specification or prosecution history of the '817 Patent require the electronic solicitation message to include a proxy ballot. Instead,

Broadridge wrongly urges the Court to import the requirement of a proxy ballot based on an alleged disclaimer from the parent '487 Patent.[7]   Specifically, Broadridge relies upon the fact that during prosecution of the '487 Patent, the applicant amended claims containing an "electronic solicitation message," adding the limitation "wherein the electronic solicitation message includes an electronic proxy ballot and a solicitation content."   Broadridge tries to use this amendment of the '487 Patent as a disclaimer that effects the '817 Patent, even though the '817 Patent uses different claim language:

| '487 Patent claim language | '817 Patent claim language |
|---|---|
| ". . .an electronic solicitation message *wherein the electronic solicitation message includes an electronic proxy ballot and a solicitation content*" | ". . . an electronic solicitation message *that provides shareholder access to a solicitation content*" |

The above claim language demonstrates that there are different kinds of "electronic solicitation messages," and that the claimed "electronic solicitation messages" of the '487 and '817 Patents have differing characteristics and scopes.   Broadridge even concedes the broader scope of electronic solicitation messages in the '817 Patent by proposing a construction that only attempts to import the proxy ballot requirement, and not the solicitation content requirement, from the '487 Patent.

Broadridge's disclaimer argument is contrary to Federal Circuit law, which holds that disclaimer based on an amendment does not apply when, as here, the claim term in the descendant patent uses different language.  *See, e.g., Ventana Medical Systems, Inc. v. Biogenex Laboratories, Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006) ("Because claims 1 and 5 of the

---

[7]  Broadridge's proposed construction for "electronic solicitation messages," would also make the express proxy ballot requirement in the '487 patent's claims redundant, violating yet another tenet of claim construction.  *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 781 (Fed. Cir. 2010) (holding that the "notice function [of patent claims] would be undermined . . . if courts construed claims so as to render physical structures and characteristics specifically described in those claims superfluous" which is why claims are construed "with an eye toward giving effect to all of their terms")

[descendent] patent use different claim language ... the alleged disclaimer [of the ancestor patent] ... does not apply to the asserted claims of the [descendent] patent"); *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1383 (Fed. Cir. 2003) ("Although a parent patent's prosecution history may inform the claim construction of its descendant, the [parent] patent's prosecution history is irrelevant to the meaning of this limitation because the two patents do not share the same claim language."); *3M Innovative Properties Co. v. Louis M. Gerson Co., Inc.*, Civil No. 08-4960, 2010 WL 4106712, at *11 (D. Minn. Oct. 12, 2010) (holding that prosecution history related to the term "self-supporting liner" was "not relevant" and "cannot limit" the child patent's claimed "liner . . . capable of standing unsupported on the base.")  The '487 and '817 patents do not use the same claim language and, as Broadridge concedes, do not have the same scope regarding electronic solicitation messages.  Therefore, any disclaimer from the '487 Patent does not pass through to the '817 Patent.[8]

The cases cited by Broadridge in its attempt to import a claim limitation from the '487 Patent into the '817 patent do not apply to the present case.  *See* D.I. 34 Br. at 13–14 (citing *Hakim v. Cannon Avent Group, PLC*, 479 F.3d 1313 (Fed. Cir. 2007) and *Heuft Systemtechnik GMBH v. Industrial Dynamics Co., Ltd.*, 282 F. App'x 836 (Fed. Cir. 2008)).  *Hakim* involved a disclaimer resulting from a patentee's arguments statements defining the ***invention*** itself, not the

---

[8]  In addition to being incorrect as a matter of law, Broadridge's disclaimer argument also fails to address important facts, including that the Examiner recognized that the claims of the '817 Patent—including claim 1, which contains the term "electronic solicitation message"—are broader than those of the '487 Patent and that ***the applicant re-submitted and the Examiner re-considered the Purcell reference*** during the prosecution of the '817 Patent.  *See* Ex. 7 ('817 Patent app., 12/31/07 Office Action) at 4 ("[T]he instant claimed invention is a broader recitation of the '487 Patent.  For instance, see claim 1 of both the current application and the '487 Patent."); Ex. 8 ('817 Patent app., 12/31/07 Information Disclosure Statement) (listing *Purcell* as a reference cited by applicant and considered by Examiner); *see also Hakim*, 479 F.3d at 1318 ("A disclaimer made during prosecution can be rescinded" when "the prosecution history [is] sufficiently clear to inform the examiner that the previous disclaimer, and the prior art it was made to avoid, may need to be revisited.").

mere addition of a claim limitation.  *Hakim*, 479 F.3d at 1313 ("the district court held Hakim to his arguments in the patent application that the ***invention*** includes the presence of a slit. . .").  Here, by contrast, the patentee simply narrowed claims by adding a limitation, but never argued that the entire ***invention*** was so limited.

The only other case on which Broadridge relies for this point is an unpublished case in which disclaimer likewise resulted from the applicant's statements about the ***invention*** while amending the claim language.  *See Heuft*, 282 Fed. App'x. at 839–41.  (quoting applicant's statements during prosecution that "the present ***invention*** provides for the increase and sharp decrease at an angle <<beta>> of the distance between the railings. . .," and "the angle <<beta>> of the present ***invention*** also produces. . ."); *see also id.* at 840 ("Once again, Heuft argued that the relatively large angle recited in the claims ***distinguished the invention*** over [the prior art].").  Based on the combination of the applicant's arguments regarding its invention and the related amendments, the court found disclaimer.[9]  *Id.* at 840-42 ("Consequently, the ***arguments and amendments*** Heuft made during the prosecution. . .operate to disclaim. . .").

Broadridge cites no cases in which merely amending claims limits a later patent's claims that do not contain the same claim language.  To the contrary, when disclaimer is based solely on claim language, rather than on arguments regarding the invention itself, the same language must be present in the later application in order for the disclaimer to apply.  *See, e.g., Saunders Group, Inc. v. Comfortrac, Inc.,* 492 F.3d 1326, 1333 (Fed. Cir. 2007) ("When the purported disclaimers are directed to specific claim terms that have been omitted or materially altered in subsequent applications ***(rather than to the invention itself)***, those disclaimers do not apply.").

---

[9] The court in *Heuft* also noted that the added limitation in question "directly tracks the only discussion in the specification indicating an appropriate range for stably arranging containers." *Id.* at 841.  In contrast, Broadridge's proposed construction would impermissibly read out an embodiment. *See, e.g.*, Ex. 1 ('817 Patent) at 8:8–13.

**(ii)**     **"AUTHORIZED PARTY" AND "AUTHORIZED SHAREHOLDERS"**

| Claim Term | Inveshare | Broadridge |
|---|---|---|
| Authorized Party | a party, other than an issuer, that is authorized to send electronic solicitation messages | a party, other than an issuer, that is interested in the voting outcome of the shareholder proposals and is authorized to send electronic messages |
| Authorized Shareholders | shareholders authorized to access solicitation content | voters holding positions for the issuer as of the record date |

The parties' dispute regarding the construction of "authorized party" and "authorized shareholders" stems from Broadridge's attempt to add limitations to commonly understood terms. These terms have ordinary meanings, and Broadridge has not identified any legitimate exceptions to the "heavy presumption" of ordinary meaning. *CCS Fitness*, 288 F.3d at 1366–67.

With respect to both terms, Broadridge relies solely on statements in the prosecution histories of the '487 Patent ("authorized party") and the '817 Patent ("authorized shareholders") informing the PTO examiner where support for new claim language can be found. D.I. 34 at 17–18. Broadridge's reliance on these statements is misplaced. All claim language is required to have support in the specification. *TurboCare Div. of Demag Delaval Turbomachinery Corp. v. General Elec. Co.*, 264 F.3d 1111, 1118 (Fed. Cir. 2001) ("When the applicant adds a claim or otherwise amends his specification after the original filing date . . . the new claims or other added material must find support in the original specification."). This does not mean that all claim language is necessarily defined by any supporting portion(s) of the specification. Indeed, the opposite is true—the specification may not limit the plain meaning of claim terms absent clear and unmistakable intent. *See Phillips*, 415 F.3d at 1320 ("[O]ne of the cardinal sins of patent law" is "reading a limitation from the written description into the claims.").

Because Broadridge has not identified a clear and unmistakable intent to redefine the terms "authorized party" and "authorized shareholders," they must be given their ordinary

meanings. Regarding "authorized party," Broadridge seeks to insert "that is interested in the voting outcome of the shareholder proposals," apparently to limit the term to shareholder proposals. The single passage in the specification upon which Broadridge relies does not redefine the term "authorized party."[10] And Broadridge's proposed construction conflicts with the specification's description of the parties authorized to send messages.[11] Regarding "authorized shareholders," Broadridge seeks to add "as voters holding positions for the issuer as of the record date," which is inconsistent with the plain meaning of the term, the specification,[12] and the prosecution history.[13] Accordingly, this Court should give "authorized party" and "authorized shareholders" their plain and ordinary meaning because they were not redefined by the specification or file history.

---

[10] The portion of the specification that Broadridge relies on uses the term "*interested* party," not "*authorized* party," and is discussing embodiments, rather than defining the invention. Additionally, Broadridge's proposed construction ignores part of the cited language; the "etc." at the end of the parenthetical shows that the parenthetical is providing examples, not a definition. Ex. 1 ('817 Patent) at 5:41–44.

[11] *See* Ex. 1 ('817 Patent) at 5:5–15 ("Sender - A constituent (e.g., corporations, mutual fund companies, stockholders or bondholders, and/or any other constituent on behalf of stockholders and/or bondholders) or an agent acting on their behalf. The sender shall have the authority to send a message.") *See also id.* at 4:4–8 (defining "constituent"), 7:4–13.

[12] The '817 Patent specification uses "authorized shareholders," in accordance with its ordinary meaning. *See e.g.*, Ex. 1 ('817 Patent) at 2:62–67 ("The system includes a processor executing a plurality of components including [a] component[] . . . for tagging the electronic solicitation message to validate that a *shareholder is authorized to view the solicitation content*.")). Moreover, the portion of the specification upon which Broadridge relies ('817 patent at 7:54–57, discussing figure 4) is merely discussing an embodiment, not purporting to define the invention itself. *See id.* at 19–22 ("FIG. 4 illustrates a block diagram providing additional functional detail of the software modules and functions of the Proxy Voting Platform *in an exemplary embodiment* of the present invention.")).

[13] The '817 Patent prosecution history shows that the language relied on by Broadridge is an example and not a definition. *See* Ex. 6 ('817 Patent app., 6/30/08 Office Action Resp.) at 16 ("*For example*, authorized shareholders *could include* shareholders as of a record date that would be authorized to vote their shares at a shareholder meeting.").

### (iii) "TAGGING"

| Inveshare | Broadridge |
|---|---|
| plain and ordinary meaning, *i.e.*, labeling; associating one or more characters with a set of data that contain information about the set; using a unit of information as a label or marker | the act of placing a set of bits or characters that identifies various conditions about data in a file and is often found in the header records of such files |

The tagging described in the '817 Patent simply permits an association of data (electronic solicitation) with authorized shareholders.  *See, e.g.*, Ex. 1 ('817 Patent) at 2:58–66 ("tagging the electronic solicitation message to validate that a shareholder is authorized to view the solicitation content."); Ex. 6 ('817 Patent app., 6/30/08 Office Action Resp.) at 16 ("The solicitation message is tagged to ensure that only authorized shareholders can access and view it."))  This is consistent with the term's plain meaning and Inveshare's proposed construction.

Broadridge offers a construction of its own making, which is partly informed by a dictionary definition.  Dictionary definitions are less favored extrinsic evidence that in order to be relied upon, must be consistent with the intrinsic evidence.  *See, e.g., Ring & Pinion Service, Inc. v. ARB Corp. Ltd.*, No. C09-0586, 2011 WL 646917, at *5 (W.D. Wash. Feb. 18, 2011) ("[E]xcessive reliance on dictionary definitions is improper because the 'ordinary meaning' of a claim term is not the abstract dictionary definition, but the 'meaning to the ordinary artisan after reading the entire patent.'") (quoting *Phillips*, 415 F.3d at 1321); *Phillips*, 415 F.3d at 1319 ("extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence.").

The very dictionary on which Broadridge relies supports Inveshare's proposed construction.  D.I. 34 at Ex. 15 ("(5) A name (label, mnemonic) assigned to a data structure, such

as a field or record." . . . (7) A field that identifies the contents of a data record").[14]   These

definitions are ignored by Broadridge, which instead cherry-picked a small portion of a

definition that does not make sense in the context of the '817 patent and contains limitations

found nowhere in the intrinsic evidence.   The ***rest*** of the dictionary definition on which

Broadridge relies reads, "This type of tag identifies the entire file, and the tags occupy

predefined locations in the header rather than embedded throughout the file."   D.I. 34 at Ex. 15.

This definition has no meaning in the context of the '817 patent, which does not require

identification of entire "files" or mention "headers" or "predefined locations" for tags.   The

Federal Circuit rejects this kind of selective, of out of context use of dictionary definitions.   *See*

*Phillips*, 415 F.3d at 1321 (Fed. Cir. 2005) ("The main problem with elevating the dictionary to

such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the

meaning of claim terms within the context of the patent.").   Moreover, Broadridge's proposed

construction adds, without any intrinsic or extrinsic support, an additional requirement that

"tagging" involves "placing a set of bits or characters" into a file, while the dictionary that

Broadridge cites confirms that tags can, for example, simply be "assigned to" or "identify" data

structures.   D.I. 34 at Ex. 15, definitions (5) and (7).   Accordingly, this Court should reject

Broadridge's proposed construction.

---

[14]Other dictionaries are in accord.   *See* Ex. 9 (Wiley Electrical and Electronics Engineering
Dictionary) ("One or more bits that serve to identify data, such as that in a database."), Ex. 10
(McGraw-Hill Dictionary of Scientific and Technical Terms) ("A unit of information used as a
label or marker."); Ex. 11 (Authoritative Dictionary of IEEE Standards Terms) ("2(A) Same as
flag. (B) Same as label. (3) (data management) One or more characters associated with a set of
data, containing information about the set.").

### (iv)   "A COMPONENT"

| Inveshare | Broadridge |
|---|---|
| plain and ordinary meaning | software module |

This term has an ordinary meaning which has not been altered by one of the four recognized exceptions. *CCS Fitness*, 288 F.3d at 1366–67. Once again, however, Broadridge proposes a construction that impermissibly conflicts with the intrinsic evidence and that is based on an incomplete portion of a selected dictionary definition. The actual definition of "component" in the dictionary cited by Broadridge is "[o]ne element of a larger system." D.I. 34 at Ex. 14. Broadridge claims, without explanation or support, that the '817 Patent "is a software patent," and therefore limits its proposed construction to a portion of its dictionary definition of "component" that is discussing "software components." This is improper because the '817 Patent claims "components," not "software components," and there is no evidence that the patentee chose to depart from the ordinary definition of "component."

The dictionary definition of "component" offered by Broadridge also teaches that a component can be of varying size, "as long as it is a part of a larger system." D.I. 34 at Ex. 14. Broadridge's proposed construction neglects the central idea that a "component" is a part of a larger system. Moreover, even the clipped portion of the dictionary definition Broadridge relies on does not limit software components to a single module, as Broadridge attempts to do.[15] (*Id.* ("Software components are **routines or modules** within a larger system.").)

Broadridge admits that "'component' could mean something more general" than Broadridge's proposed construction, but that "that term must be read in light of the specification,

---

[15]A real-world example of the principle that a component is simply a piece of a larger system and is not limited to a singular item is that although it can be said that the Eastern District of Pennsylvania is "a component" of the federal judiciary, it is made up of many courtrooms and departments, and is not limited to one location or thing.

which describes software modules." D.I. 34 at 21. Figure 5 of the '817 Patent, however, shows

that "software modules" and "components" have a different scope.[16] Ex. 1 ('817 Patent) at 3:23–

26 ("FIG. 5 illustrates a block diagram showing the ***software modules and components***."). This

language shows that a "component" is not limited to a "software module," as Broadridge

contends. Accordingly, "component" should be given its ordinary meaning.

> **(v)** **"A COMPONENT FOR TAGGING THE ELECTRONIC SOLICITATION MESSAGE TO VALIDATE THAT A SHAREHOLDER IS AUTHORIZED TO VIEW THE SOLICITATION CONTENT"**

| Inveshare | Broadridge |
|---|---|
| plain and ordinary meaning | a software module for tagging the electronic solicitation message and using the tagged electronic solicitation message to validate a shareholder's authorization to view the solicitation content |

Here again, Broadridge is attempting to add limitations to unambiguous claim language.

Broadridge's proposal adds the phrase "and using the tagged electronic solicitation message" to

the claim language, requiring that 1) the tagged message is actually used to validate a

shareholder's authorization to view solicitation content; and 2) the same component performs the

tagging and validation. Broadridge argues that the "tagging" in Claim 10 is different from the

"tagging" in the other claims of the '817 Patent because, according to Broadridge, in Claim 10

"'the 'tagging' actually performs the validation." D.I. 34 at 23. Nothing in the intrinsic

evidence, however, suggests or discloses how "tagging actually performs validation." Nor does

the specification explain how that would work, or suggest that there are different kinds of

"tagging." To the contrary, as Broadridge admits, "[t]he specification describes the 'tagging'

and 'validation' functions in two different modules." D.I. 34 at 22.

---

[16]Broadridge mistakenly believes that "the term 'component' appears only in the '817 Patent claims." D.I. 34. at 21. The '817 Patent specification, however, also mentions "components" at column 2, lines 62–67.

Broadridge's proposed added limitation does not appear anywhere in the specification or claim language, and Broadridge does not identify any of the four recognized exceptions for departing from the claim language. Moreover, Federal Circuit precedent presumes that the same claim terms have the same meaning. *See Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1087 (Fed. Cir. 2009) ("We apply a presumption that the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims."). Therefore, this Court should reject Broadridge's construction.

To use a plain English analogy, the term "to validate" in this claim term does not require mandatory and immediate validation by the tagging entity, just as the sentence "I placed a tag on my car to validate that I am authorized to enter the parking lot" does not require mandatory and immediate validation to enter the lot at the same time that the tag is placed, or that validation is performed by the person placing the tag, but instead suggests that the tag is able to accomplish validation, if and when necessary.[17]

Broadridge's apparent claim differentiation argument based on the ***independent*** claims of the '817 Patent also fails. D.I. 34 at 23. As the *Karlin* case explains in the part of the sentence that Broadridge cut out of its brief, claim differentiation "normally means that limitations stated in ***dependent*** claims are not to be read ***into the independent claim from which they depend***." *Karlin Technology Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 972 (Fed. Cir. 1999.)

---

[17]Using an infinitive as an adverb, as "to validate . . ." is used by this term, denotes purpose or intent, without any particular temporal requirement. *See, e.g.,* Ex. 13 (http://www. english4today.com/englishgrammar /grammar/inf5.cfm, last visited 4/19/2011) ("The most common uses of the infinitive are: To indicate the purpose or intention of an action (where the 'to' has the same meaning as 'in order to' or 'so as to'). . .")

(vi)    "ELECTRONIC MESSAGING"

| Inveshare | Broadridge |
|---|---|
| plain and ordinary meaning; i.e., sending messages electronically. | e-mail |

Yet again, Broadridge attempts to add an unwarranted limitation into a claim term. "Electronic messaging" is simply sending messages in an electronic format. The '817 Patent does not limit "electronic messaging" to e-mail. To the contrary, the specification defines "message" as "any communication from a message 'sender' to a message 'recipient,' and defines "message format" as "[a]ny format other than mail or telephone formats, including . . ." Ex. 1 ('817 Patent) at 4:55–61. Moreover, the embodiments disclosed in the specification contain several kinds of electronic messaging other than e-mail. Figures 8, 9 and 10 of the '817 Patent disclose an inbox for "messages," as well as "message boards." And Figure 7 shows links that provide access to "Forums" for each issuer. These are all types of electronic messaging. By contrast, the '817 Patent does not mention e-mail in the context of shareholders discussing issues, the context in which term is used in the claims.[18]

The dictionary definitions offered by Broadridge conflict with the '817 patent's specification, and even with statements by Broadridge's own employees,[19] and this Court should reject them. *See Ring & Pinion Service, Inc. v. ARB Corp. Ltd.*, 2011 WL 646917, at *5 (Fed. Cir. Feb. 18, 2011) ("[E]xcessive reliance on dictionary definitions is improper because the 'ordinary meaning' of a claim term is not the abstract dictionary definition, but the 'meaning to

---

[18]The patentee mentions the terms "e-mail" and "electronic mail" once each in the '817 Patent (in a different context). *See* Ex. 1 ('817 Patent) at 4:15–24, 7:17–20. Thus, the patentee could have claimed e-mail if it had wanted to limit the term, but did not.

[19]For example, in discussing the Swift MX Proxy Voting Messaging Suite, Elizabeth Maiellano, Broadridge's Senior Director of Institution Product Strategy stated "Broadridge has led the effort with SWIFT to develop this new *electronic messaging standard* [Swift MX Proxy Voting Messaging Suite] for the financial industry. . ." *See* Ex. 15 (http://www.finextra.com /news/announcement.aspx?pressreleaseid=27227, last visited April 13, 2011).

the ordinary artisan after reading the entire patent.'"); *Phillips*, 415 F.3d at 1319 ("extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence.").

### (b)   Dependent Claim Terms

Because it is important to read and interpret the claim terms in the context of the claim language, for the Court's convenience, Inveshare has included dependent claims 2, 3, 6, 7, 9, 17 and 33 of the '817 Patent at Exhibit 12, emphasizing the terms at issue and indicating with the parenthetical number the section of the briefs in which they are addressed.

#### (i)   "VALIDATING THAT EACH SHAREHOLDER RECEIVING THE NOTIFICATION IS AUTHORIZED TO VIEW THE SOLICITATION CONTENT"

| Inveshare | Broadridge |
|---|---|
| Plain and ordinary meaning.  Broadridge's addition of "at the time each shareholder successfully receives the notification" to the claim language is unwarranted. | the ESSP validates that the receiving shareholder is authorized to view the solicitation content at the time each shareholder successfully receives the notification |

Once again, Broadridge attempts to add unwarranted limitations into the claims.   To begin, Broadridge's definition requires that an ESSP performs the validation.  This limitation is not found in the claim language, and Broadridge provides no argument or evidence for adding this limitation.  Accordingly, this Court should reject it.

Broadridge's proposed construction additionally attempts to add the temporal requirement that validation occur "at the time each shareholder successfully receives the notification."[20]   The intrinsic evidence Broadridge cites not only fails to provide the required "clear and unmistakable" intent for adding this limitation, it counsels against it.  The phrase "for

---

[20]Broadridge's argument also incorrectly assumes that the steps are required to be performed in a specific order.  *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003) ("Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one.")

every recipient successfully receiving the message and/or notification" from the '817 patent's specification, on which Broadridge relies, suggests that there are recipients to whom a message and/or notification is sent, but not successfully received.  (See '817 patent at 7:37-38.)  This is further confirmed by the immediately preceding sentence, ignored by Broadridge, which reads, "*[t]he message may or may not be retrieved by the Recipient.*"   Ex. 1 ('817 Patent) at 7:36. Thus, a recipient includes someone to whom a notification is sent, and is not limited to someone who "successfully receives" it.  *See also id.* at 7:27–35.  Additionally, there is no suggestion in the '817 Patent of how an ESSP could validate each shareholder at the time the shareholder successfully received a notification, because the patent does not contemplate tracking the successful receipt of notifications.  For the above reasons, Broadridge's proposal conflicts with the plain meaning and the specification, and this Court should reject it.[21]

### (ii)        "A PROXY PLATFORM"

| Inveshare | Broadridge |
|---|---|
| Software that provides the functions of: obtaining data from a variety of sources, coordinating the anonymous delivery and viewing of electronic solicitation messages and ballots; and using voting data to assemble and deliver voting results to an issuer, corporate plan sponsor, and vote tabulator.[22] | a software system that receives inputs and provides outputs |

---

[21]Broadridge's reliance on the definition of  "notification" in the '817 Patent specification as "[t]he actual message **to be delivered** to the recipient in electronic format and directions for accessing the message" does not save Broadridge's construction, because the present infinitive form ("to be delivered") allows for **future** delivery.   See Ex. 14 (Shertzer, Margaret, *The Elements of Grammar* 30, Macmillan Publ'g Co. 1986) ("The present infinitive denotes **the same time or future time** in relation to the action of the main verb.").

[22]Inveshare has modified its proposed construction to more closely track the specification.

The term "proxy platform" does not have an established meaning, so this Court must look to the intrinsic evidence to determining the meaning of this claim term.[23] *CCS Fitness*, 288 F.3d at 1366–67.   While Inveshare agrees that the claimed "proxy platform" receives inputs and provides outputs, this term's more specific meaning is evidenced by the very passage Broadridge quotes in its brief but largely ignores in its construction.   D.I. 34 at 24.   Broadridge cherry-picks the words "input" and "output" from the 15 lines of the patent to which it cites and quotes, but ignores the words surrounding them.   As a result, Broadridge's construction renders this limitation essentially meaningless.   Broadridge's construction of "proxy platform" does not have any relationship to proxies or proxy voting, which is contrary to the claim term and would lead to bizarre results.   For example, under Broadridge's definition, this Court's ECF system would qualify as "a proxy platform."   To the contrary, Inveshare's proposed construction closely tracks the portion of the '817 Patent specification that describes the "core functionality" provided by the proxy voting platform, and should be adopted.   Ex. 1 ('817 Patent) at 5:52–69 ("The core functionality of the system is provided by a Proxy Voting Platform . . ."); *see also Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999) (defining claim term based in part on statements in the specification describing a particular structure as "important to the invention").

## 5.       CONCLUSION

For the above reasons, this Court should reject Broadridge's proposed claim constructions and adopt those offered by Inveshare.

---

[23]Broadridge appears to agree that "proxy platform" and "proxy voting platform" have the same meaning.   *See* D.I. 34 at 24.

Dated:  April 25, 2011

*/s/ Richard K. Herrmann*
Richard K. Herrmann (I.D. #405)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
(302) 888-6800
rherrmann@morrisjames.com

David K. Callahan, P.C. (*pro hac vice*)
Adam J. Gill  (*pro hac vice*)
Serena J. Pruitt  (*pro hac vice*)
Elizabeth A. Nemo  (*pro hac vice*)
Vishesh Narayen (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 N. LaSalle St.
Chicago, IL 60654
(312) 862-2000
david.callahan@kirkland.com
adam.gill@kirkland.com
serena.pruitt@kirkland.com
elizabeth.nemo@kirkland.com
vishesh.narayen@kirkland.com

*Attorneys for Defendant and Counterclaim-
Plaintiff Inveshare, Inc.*