IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| BROADRIDGE FINANCIAL SOLUTIONS, INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 10-075-RGA |
| | : | |
| INVESHARE, INC. | : | |
| | : | |
| Defendant. | : | |

## **MEMORANDUM OPINION**

Gregory E. Stuhlman, Esq., Wilmington, Delaware; Michael A. Nicodema, Esq. (argued), Florham Park, New Jersey; Barry J. Schindler, Esq., New York, New York; Douglas R. Weider, Esq., Florham Park, New Jersey; Attorneys for Plaintiff Broadridge Financial Solutions, Inc.

Pilar G. Kraman, Esq., Wilmington, Delaware; Robert M. Vrana, Esq., Wilmington, Delaware; Denis T. Sullivan, Esq. (argued), Syracuse, New York; Attorneys for Defendant Inveshare, Inc.

April $\underline{11}$, 2012
Wilmington, Delaware

1

ANDREWS, UNITED STATES DISTRICT JUDGE:

Plaintiff Broadridge Financial Solutions, Inc. filed this action against Defendant Inveshare, Inc. seeking, in part, declaratory relief that it did not infringe U.S. Patent No. 7,475,817 ("'817 patent"). Inveshare then counter-claimed with an action for infringement of at least one claim of the '817 patent. The '817 patent claims a system for the electronic distribution of shareholder solicitation messages. The parties briefed their respective positions on claim construction, and the Court conducted a *Markman* hearing on the disputed terms. This Memorandum Opinion provides construction of the agreed upon and disputed terms.

## I. The Legal Principles of Claim Construction

Claim construction is a question of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977–78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388–90 (1996). When construing the claims of a patent, a court considers the literal language of the claim, the patent specification and the prosecution history. *Markman*, 52 F.3d at 979. Of these sources, the specification is "always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips v. AWH Corporation*, 415 F.3d 1303, 1312–17 (Fed. Cir. 2005) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). However, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.' " *Liebel–Flarsheim Co. v. Medrad*, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004) (*quoting Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)).

A court may consider extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises, in order to assist it in understanding the underlying technology, the meaning of terms to one skilled in the art and how the invention works. *Phillips*, 415 F.3d at 1318–19; *Markman*, 52 F.3d at 979–80. However, extrinsic evidence is considered less reliable and less useful in claim

2

construction than the patent and its prosecution history. *Phillips*, 415 F.3d at 1318–19 (discussing "flaws" inherent in extrinsic evidence and noting that extrinsic evidence "is unlikely to result in a reliable interpretation of a patent claim scope unless considered in the context of intrinsic evidence").

In addition to these fundamental claim construction principles, a court should also interpret the language in a claim by applying the ordinary and accustomed meaning of the words in the claim. *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 759 (Fed. Cir. 1984). If the patent inventor clearly supplies a different meaning, however, then the claim should be interpreted according to the meaning supplied by the inventor. *Markman*, 52 F.3d at 980 (noting that patentee is free to be his own lexicographer, but emphasizing that any special definitions given to words must be clearly set forth in patent). If possible, claims should be construed to uphold validity. *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir. 1984).

## II. Claim Construction

### A. Technical Background of U.S. Patent '817: Method and System for Electronic Solicitation of Votes Affecting Corporate Affairs

The '817 patent discloses a system for the electronic distribution of solicitation messages on shareholder issues. The system allows certain authorized entities, including corporate issuers, mutual fund issuers, and dissident shareholders, to use the internet as a portal to submit persuasive messages to shareholders to influence proxy elections and provide material information. These messages may be in audio, video, or text formats. The messages can be electronically tagged so that only certain groups of shareholders may view their contents. The authorized shareholders view these messages anonymously in order to prevent conflicts of interest that may arise due to the direct solicitation of voters.

### B. Agreed upon Constructions

The parties agreed upon the construction of two terms used in the claims of the '817 patent and the Court accepts them as detailed below.

| Claim Term of Phrase: | Electronic Solicitation |
|---|---|
| Agreed upon Construction: | Electronic communication about a corporate event to affect the outcome of voting on the event. |
| Claim Term: | A Proxy Platform |
| Agreed upon Construction: | A software system regarding proxy voting or other corporate voting that receives inputs and provides outputs. |

### C. Disputed Terms

The construction of the remaining terms is disputed.

#### 1. "Electronic Solicitation Message [that provides shareholder access to a solicitation content]"

| Inveshare's Proposed Construction: | An electronic solicitation message [that provides shareholder access to a solicitation content]. |
|---|---|
| Broadridge's Proposed Construction: | An electronic solicitation message that includes an electronic proxy ballot [that provides shareholder access to a solicitation content]. |
| Construction of the Court: | An electronic solicitation message that provides shareholder access to a solicitation content. |

The parties dispute the construction of the term "electronic solicitation message." The chief

dispute is whether an "electronic solicitation message" must include an electronic proxy ballot.

Broadridge argues that the applicant limited "electronic solicitation message" to include an electronic

proxy ballot when it made a disclaimer during the prosecution of U.S. Patent No. 7,207,487 ("'487

patent"), the parent patent to the '817 patent. Inveshare counters that the scope and meaning of the claim

"electronic solicitation message" is different in the '817 patent and therefore any '487 prosecution

disclaimer should not travel to the '817 child patent. Inveshare also argues that subsequent prosecution

history of the '487 patent reveals that the "electronic solicitation message" disclaimer was not necessary

for that patent's approval, and thus the disclaimer should not travel to the child patent.

The prosecution history of the parent shows that the applicant proposed an element of claim 1

relating to "electronic solicitation message:"

> A method for the electronic delivery and distribution of a solicitation for votes on
> shareholder issues from an issuer to a plurality of voters comprising the steps of . . .
> creating an electronic solicitation message for the issuer.

(D.I. 35, Exh. 7 at 17). All claims in that application were rejected as anticipated by the prior art reference

"Purcell." (D.I. 35, Exh. 8 at 2). The examiner and applicant later reached an agreement for amendments

to overcome the prior art as follows:

> The applicant proposed to amend the claims, especially independent claims 1, 12, 19, by
> including: "wherein the electronic solicitation message includes an electronic proxy
> ballot and a solicitation content" and "enable the voter to view the solicitation content
> anonymously." It was agreed that these limitations would overcome the prior art of
> record.

(D.I. 35, Exh. 9 at 17). This agreement was effectuated by a formal amendment limiting an "electronic

solicitation message" in claims 1, 12, and 19 to an electronic solicitation message wherein the electronic

solicitation message includes a proxy ballot and solicitation content. (D.I. 35, Exh. 6 at 10). These

amendments are reflected in the claims of the '487 patent itself.

Broadridge argues that the applicant's disclaimer of "electronic solicitation message" during

prosecution of the '487 patent limits the construction of "electronic solicitation message" in the '817

patent claims. This is premised on the theory that disclaimers made during the prosecution history of an

parent patent limit the corresponding claims of a child patent. Broadridge relies upon *Hakim v. Cannon

Avent Grp.*, 479 F.3d 1313 (Fed. Cir. 2007) and *Heuft Systemtechnik Gmbh v. Industrial Dynamics Co.,

Ltd.*, 282 Fed. Appx. 836 (Fed. Cir. 2008).

In *Hakim*, the applicant prosecuted an invention for a no-spill drinking cup. 479 F.3d at 1315. The

applicant needed to overcome prior art that disclosed a hole as the cup's fluid opening. *Id.* at 1315-16. To

do so, the applicant disclaimed a hole, arguing that its opening was in fact a "slit" that opens and closes.

5

*Id.* at 1316. This was accepted as a valid distinction and the application was approved. *Id.* After receiving a notice of allowance, the applicant attempted to broaden the claim by filing a continuation application changing "slit" to "opening." *Id.* The filing of continuation was accompanied by an attorney letter stating that the applicant was broadening claims with the application. *Id.* The continuation application was allowed without comment by the examiner. *Id.* The Federal Circuit held that because the applicant disclaimed anything broader than a "slit" in the parent patent, the applicant could not recapture "opening" in the child patent, and the notice given to the examiner was not sufficient notice that the applicant rescinded the "slit" disclaimer. *Id.* The court's holding was that, "[a]lthough a disclaimer made during prosecution can be rescinded, permitting recapture of the disclaimed scope, the prosecution history must be sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be re-visited." *Id.* at 1318.

In *Heuft*, the Federal Circuit found that disclaimers made during prosecution of a parent patent applied to the child patent at issue. 282 Fed. Appx. at 840-41. That invention involved the stabilizing of containers during bottle manufacture. *Id.* at 839. The applicant had clearly and repeatedly distinguished a prior art by requiring angles between thirty and one-hundred degrees when narrowing the distance between guardrails to interrupt the chaotic behavior of bottles. *Id.* at 840-841. "The salient question, however, [was] whether this disclaimer flow[s] to the child patent." *Id.* at 841. The *Heuft* court stated that it was "well-settled" that "prosecution disclaimer may arise from disavowals made during the prosecution of ancestor patent applications.'" *Id.* at 1314 (quoting *Ormco Corp.* v. *Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007)). The *Heuft* court continued that, "the issue is whether the disclaiming statements [the applicant] made with respect to the [parent] patent related to the same subject matter that is at issue in the [child] patent." 282 Fed. Appx. at 841. In that case, the claim language in the parent application was sufficiently similar, indeed, identical, to the claim language in the child patent to apply the disclaimer to the child patent. *Id.* at 841-42.

Broadridge argues that *Hakim* and *Heuft* are on point, as the disclaimer in the prosecution history of the '487 patent covers the same subject matter as the claims at issue in the '817 patent. Specifically, the

term "electronic solicitation message" was limited to include an electronic proxy ballot in the parent

claims. According to Broadridge, because that term is now used again in the child claims, the "same

subject matter" test has been satisfied and the disclaimer should travel to the child patent. The close

relation of subject matter, however, does not conclusively answer the question of whether the disclaimer

travels between generations; it is only relevant to the question.[1] The Federal Circuit has held that "when

the purported disclaimers are directed to specific claim terms that have been omitted or materially altered

in subsequent applications (rather than the invention itself), those disclaimers do not apply." *Saunders*

*Group Inc.*, *v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007). Further "the doctrine of

prosecution disclaimer generally does not apply when the claim term in the descendant patent uses

different language." *Ventana Med. Sys. v. Biogenex Labs.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006).

Therefore, even if the '487 patent disclaimer relates to the same subject matter at issue in the '817 patent

claims, it may not necessarily affect the '817 claim construction if the claim language is materially

different.

Relatively nuanced variations in claim language between patent generations have barred

importing a disclaimer to a child claim. *See ResQNet.com, Inc., v. Lansa, Inc*, 346 F.3d 1374, 1383 (Fed.

Cir. 2003). In *ResQNet.com*, the Federal Circuit held that the parent patent claim must be "synonymous"

with the claim at issue in the child patent for the disclaimer to travel. *See id.* at 1375. In that case, both the

parent patent and the continuation-in-part child patent dealt with "screen recognition" technology. *See id.*

at 1375. Both claims were means plus function claims that covered related subject matter of "identifying

… a particular screen to be displayed to said user." *Id.* at 1382. The Federal Circuit, however, analyzed

the differences in claim language to deny importing the disclaimer to the child patent:

> Although the related patents are similar, their claims are not identical. Sandwiched within
> the functional language of the '608 claim is the following clause: 'based upon a
> position[,] length and type of *each of a plurality* of fields.' '608 patent, col. 4, ll. 42-43
> (emphasis added). As the emphasis indicates, the language of claim 1 of the '608 patent
> differs from the language of claim 1 of the '961 patent. *See* '961 patent, col. 8, ll. 23-25

---

[1] "When the application of prosecution disclaimer involves statements from prosecution of a familial patent relating
to the same subject matter as the claim language at issue in the patent being construed, those statements in the
familial application are relevant in construing the claims at issue." *Ormco Corp.*, 498 F.3d at 1314.

("said ID being generated as a function of the number, location, and length of *each* field in said first image")(emphasis added). This difference is significant.

*Id.* The Federal Circuit noted that "each of a plurality of fields" was not synonymous with "every field." "Plurality" suggested "at least two" fields; "every field" left room for only a single field. *Id.* The claims were thus not "synonymous" and there was no "clear and unmistakable" disavowal of the child patent claim scope. *See id.* at 1382-83.

Inveshare highlights two differences between the language (and thus function) of the "electronic solicitation message" between the generations: (1) the '487 claim language says "creating an electronic solicitation message" while the '817 claim language says "receiving an electronic solicitation message" and (2) the '487 claim's "electronic solicitation message" is described as *including* an electronic proxy ballot and solicitation content while the '817 patent is described as *providing* shareholder access to a solicitation content. The language at issue follows:

| '487 Patent, Claim 1 | "creating an electronic solicitation message wherein the electronic solicitation message includes an electronic proxy ballot and a solicitation content" |
|---|---|
| '817 Patent, Claim 1 | "receiving an electronic solicitation message that provides shareholder access to a solicitation content" |

The second distinction is significant. "Providing access to" and "includes" are not synonymous terms and the differences between them matter. Specifically, the "provides access to" language allows the "electronic solicitation message" to access materials external to the message itself. "Includes" is a more restrictive word that envisions all content as internal to the message. The "electronic solicitation message" of the '817 patent thus covers a broader set of material than the "electronic solicitation message" of the '487 patent. There is support for this construction within the specification:

Electronic Distribution or Delivery of Communication from Management or Other Shareholders—Providing access to electronic text, audio, and/or video content (collectively referred to as "solicitation content") by means of embedding the solicitation content in an electronic proxy ballot, providing one or more links to the solicitation content in an electronic ballot or electronic voting platform, and/or pushing the

8

solicitation content (or links thereto) directly to shareholders or bondholders by electronic mail.

'817 Patent, 4:16-24. The specification states that the electronic solicitation message may provide access to solicitation content by "pushing" links directly to the shareholders. *Id.* This is broader than what is covered by claim 1 of the '487 patent, because such solicitation content is not "included" within the "electronic solicitation message" itself. This may be a fine distinction, but the similarly fine distinction between "every field" and "each of a plurality of fields" was held to be a material difference that barred the transfer of a disclaimer between parent-child patents in *ResQNet.com,* 346 F.3d at 1383. The language is therefore not "synonymous" as required by *ResQnet.com. Id.* For all these reasons, the Court declines to extend the '487 application prosecution disclaimer to the term "electronic solicitation message" of the '817 patent.[2]

## 2. "Solicitation Content"

| **Inveshare's Proposed Construction** | Electronic text, audio, video or other corporate communication from a corporation or mutual fund company, or authorized party, or agent acting on their behalf, about a corporate event to affect the outcome of voting on the event, other than initially disseminated disclosure documents such as annual reports and proxy statements. |
|---|---|
| **Broadridge's Proposed Construction** | Electronic text, audio or video or other corporate communication from a corporation or mutual fund company, or authorized party, or agent acting on their behalf, about a corporate event to affect the outcome of voting on the event, but not content received while participating in an online electronic meeting. |
| **Court's Construction** | Electronic text, audio, video or other corporate communication other than governmentally-required disclosures, from a corporation or mutual fund company, or authorized party, or agent acting on their behalf, about a corporate event to affect the outcome of voting on the event. |

---

[2] Because the Court holds that the language of the relevant claims is not sufficiently similar to justify limiting "electronic solicitation message" in the manner proposed by Broadridge, it need not address Inveshare's argument that the parent disclaimer was not necessary for approval of the parent patent and should therefore not travel to the child patent claims.

9

The parties dispute the construction of "solicitation content." There are two main disputes: (1) whether "solicitation content" may include governmentally-required disclosure documents such as annual reports and proxy statements, and (2) whether "solicitation content" may include content received while participating in an online electronic meeting. The Court discusses each issue in turn.

### i. May "solicitation content" include governmentally-required disclosure documents such as annual reports and proxy statements?

Inveshare argues that "solicitation content" only comprises electronic information "other than initially disseminated disclosure documents," as the goal of the '817 patent is to provide shareholders with persuasive content, not supply them with governmentally-mandated disclosures. Broadridge, however, insists than any such limitation improperly narrows the scope of the claim and is without justification in the specification or prosecution history.

The specification defines "solicitation content" as "[t]ext, audio, video or other corporate communication from a corporation or mutual fund company, or agent acting on their behalf." '817 Patent, 5:16-18. It further states that "the purpose of such electronic solicitation can be to provide information, encourage voting, or persuade voting decisions," but does not disclose additional details as to the substance of the "solicitation content." *Id.* at 4:40-43. Prosecution history is important to informing the meaning of claim language, as it demonstrates how the applicant understood his invention. *See Phillips*, 415 F.3d at 1317. During prosecution, the applicant and the examiner discussed the need to overcome the Purcell prior art. (D.I. 35, Exh. 9 at 1). In distinguishing Purcell, the applicant remarked that "Purcell teaches online delivery of investor documents and tabulation and processing of investor instructions (abstract)" and that in Purcell:

> ...the issuers and other interested parties have been unable to communicate with these individuals because of their status, preventing those voters from receiving valuable information not provided in the disclosure material (e.g. proxy statement and annual reports) as taught by Purcell. Furthermore, Purcell does not teach enabling the voter to consider additional data not described in the shareholder electronic documents disseminated initially.

10

(D.I. 35, Exh. 4 at 11). Broadridge argues that this passage is merely a description of the prior art and cites to the Federal Circuit's rule that such a description is not clear and unmistakable disclaimer. *Eolas Technologies Inc. v. Microsoft Corp.* 399 F.3d 1325, 1337 (Fed. Cir. 2005). Nothing within the prosecution history forbids governmentally-required disclosure documents as part of solicitation content. It would be error to exclude such disclosure documents from the claim coverage absent a mandate by the intrinsic evidence. The intrinsic evidence, however, manifests a compelling inference that the substance of "solicitation content" cannot be disclosure documents alone. This is supported by the applicant's treatment of Purcell. That art was criticized for its inability to enable the voter to consider "additional data not described in the shareholder electronic documents disseminated initially." (D.I. 35, Exh. 4 at 11). The applicant further emphasized the shortcomings of Purcell as "preventing those voters from receiving valuable information not provided within the disclosure material." *Id.* With these statements, the applicant strongly indicates that "solicitation content" consists of something more than disclosure documents. The notion that this "valuable information" is persuasive materials is strongly suggested by further prosecution history:

> Similar to the teachings of Purcell, Parmasad, et al. is concerned with delivery of legally required disclosure materials and the mechanism of voting of proxies. The present invention is directed to a method to send persuasive messages with the intent to sway a vote while protecting the voter who chooses to remain anonymous to the company.

(D.I. 42, Exh. 5 at 3). Language describing the "present invention" as a whole is particularly strong evidence of the scope of the invention. *See Verizon Service Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007). Here, the applicant stated that "the present invention is directed to a method to send persuasive messages with the intent to sway a vote while protecting the voter who chooses to remain anonymous to the company." Persuasive messages are regarded as essential. Thus, "solicitation content" does not include governmentally-required disclosure documents.

### ii. Does the '817 Patent include content received during an on-line meeting?

Broadridge argues that the applicant disclaimed "solicitation content" received during an online meeting. Inveshare concedes that the invention does not supply a platform for conducting online

11

meetings. Inveshare maintains, however, that this should not preclude a shareholder from receiving

"solicitation content" while an on-line meeting is taking place. For statements made during prosecution to

serve as disclaimer, the statements must be a clear and unmistakable surrender of subject matter. *Ecolab,*

*Inc. v. FMC Corp.,* 569 F.3d 1335, 1342 (Fed. Cir. 2009). Distinguishing prior art is the inventor's way of

explaining what claims do not cover and is a disclaimer. *Id.* However, isolated statements that appear to

disclaim subject matter should be viewed within the context of the entire prosecution history to ensure

that clear and unmistakable disclaimer occurred. *Id.*

The applicant made various statements during the prosecution of both the '487 and '817 patents

relevant to this issue. Broadridge first provides prosecution history from the parent '487 application to

support the argument that the applicant disclaimed content received while participating in an on-line

meaning:

> Mitchell, et al. is not relevant to the claimed invention since it relates only to conducting
> an electronic meeting and voting securely over the network that is established. The
> present invention does not claim participation and voting at annual meetings that are
> conducted online.

(D.I. 35, Exh. 6 at 13). Broadridge further provides prosecution history from the application of

the '817 patent itself:

> The claimed invention as recited in Claim 1, does not claim participation and anonymous
> voting at electronic meetings that are conducted online, as taught by Ward, et al. The
> claimed invention enables the authorized shareholder to view solicitation content
> anonymously at any time after the solicitation content is made available...such as the
> period of time between electronic delivery of solicitation content...and the participation
> in an online meeting...solicitation content can also be viewed by authorized shareholders
> after the voting process as long as it remains available for viewing. There is no teaching
> of accessing and viewing solicitation content anonymously by authorized shareholders in
> Ward, et al.

(D.I. 35, Exh. 13 at 17-18). Inveshare concedes that the '817 invention does not facilitate direct

participation and voting at on-line meetings. Inveshare maintains, however, that this does not preclude the

invention from distributing solicitation content while the meeting is taking place, so long as the invention

does not stream the meeting itself, does not allow for on-line voting, and does not provide a platform for

shareholder participation. Broadridge argues that these statements go further than disclaiming

participation and voting in on-line meetings; they disclaim the receipt of any solicitation content while the meeting is taking place.

The prosecution history states that solicitation content is viewable "at any time after the solicitation content is made available." *Id.* An example is given of when this may occur: "such as the period of time between electronic delivery of solicitation content...and the participation in an online meeting." *Id.* Finally, "solicitation content can also be viewed by authorized shareholders after the voting process so long as it remains available for viewing." *Id.* Broadridge maintains that solicitation content cannot be "made available" (i.e., received) during the on-line meeting, because these remarks envision only viewing the content "between" the time of electronic delivery and the inception of the meeting, but not during the meeting itself. The "such as" language, however, signals that the applicant is providing only one example of when solicitation content may be viewable. It cannot be read as an all-encompassing restriction on when the content may be received, as nothing explicitly excludes the receipt of the solicitation content while an on-line meeting takes place. This inference is further supported by the prosecution history explicitly allowing for the solicitation content to be viewed "at any time." (D.I. 35, Exh. 13 at 18). The applicant rejected limitations on a shareholder's ability to access "solicitation content." For all these reasons, the Court will not limit "solicitation content" from being received while an on-line meeting is taking place. Thus, the Court's construction is based on the inventor's definition and the specification. Broadridge's arguments are rejected because they are inconsistent with the prosecution history.

### 3. "Authorized Party"

| Inveshare's Proposed Construction | A party, other than an issuer, that is authorized to send electronic solicitation messages. |
|---|---|
| Broadridge's Proposed Construction | A party, other than an issuer, that is interested in the voting outcome of the shareholder proposals and is authorized to send electronic solicitation messages. |
| Court's Construction | A party, other than an issuer, that is authorized to send electronic solicitation messages. |

13

The parties dispute the construction of "authorized party." The term "authorized party" is important because an "authorized party" is empowered to use the invention to send messages to authorized shareholders.[3] Broadridge argues that "authorized party" must be limited to entities "interested in the voting outcome of the shareholder proposals" and points to prosecution history where the applicant expanded the definition of the sender of electronic solicitations, amending "from an issuer" to "from an issuer or authorized party." (D.I. 35, Exh. 6 at 2). The applicant identified the following portion of the specification as support in making this amendment:

> a corporation, mutual fund company, and/or any other interested party (i.e., voters interested in shareholder proposals or other corporations in the case of takeover proposal, etc.) desires to convince voters to vote either for certain proposal(s), against certain proposal(s), abstain from certain proposal(s), or withhold their votes from certain proposal(s).

*Id.* at 10 (identifying lines 5:42-47). Broadridge argues that because the language cited to support the amendment included the parenthetical fleshing out examples of an "authorized party," these examples represent a complete listing of "authorized parties." Inveshare acknowledges that these examples are cited in support of the amendment, but argues that an applicant's citation to the specification to justify an amendment should not limit the amended claim.

Inveshare is correct. To restrict "authorized party" to the cited examples would commit the error of limiting a claim term to its preferred embodiments. Moreover, the "etc." ending the list of examples within the parenthetical indicates that the examples were not intended to be exhaustive. This is confirmed by the prosecution history of the '487 parent, where the applicant states that an authorized party may be a party authorized by a government agency, including the SEC. (D.I. 35, Exh. 6 at 10).[4] Finally, claims 9, 22, and 32 explicitly include "a person or entity authorized by a regulatory agency, and an electronic solicitation systems provider" as possible "authorized parties." These entities are clearly not interested in

---

[3] The relevant excerpt of claim 1 is: "A method for the delivery and distribution of an electronic solicitation on shareholder issues from an issuer or authorized party to a plurality of authorized shareholders..."

[4] "Newly added claims 21, 22 and 23 add the limitation that the authorized party can be a dissident shareholder or any party authorized by a government agency. The SEC is the government agency that can authorize the solicitation." *Id.*

the voting outcome. For all these reasons, the Court does not limit "authorized party" to parties interested in the voting outcome, as proposed by Broadridge, and adopts Inveshare's plain meaning construction.

### 4. "Authorized Shareholder"

| **Inveshare's Proposed Construction** | Shareholders authorized to access solicitation content. |
|---|---|
| **Broadridge's Proposed Construction** | Voters holding positions for the issuer as of the record date. |
| **Court's Construction** | Shareholders authorized to access solicitation content. |

The parties dispute the construction of the term "authorized shareholder." This term is important because only "authorized shareholders" may receive electronic solicitations.[5] Inveshare proposes a plain meaning construction of "shareholders authorized to access solicitation content," while Broadridge proposes "voters holding positions for the issuers as of the record date." Broadridge proposes to limit the amended term to the examples identified by the applicant in support of the amendments during the prosecution of the parent application.[6] The applicant cited the following embodiments:

> The message tagging module 24 tags each message with issuer and meeting identifiers. This enables only those voters holding positions for the issuer as of the record date to view the electronic solicitation...Message presentation module 28 validates the right of the voter to view or listen to the electronic solicitation message.

(D.I. 35, Exh. 13 at 16); *See also* '817 Patent, 7:54-61. Broadridge provides no additional reasoning for limiting "authorized shareholders" to "voters holding positions for the issuer as of the record date." Further prosecution history, however, shows that Broadridge's proposed limitation is only an example of "authorized shareholders" and not an exhaustive definition: "[f]or example, authorized shareholders could include shareholders of a record date that would be authorized to vote their shares at a shareholder

---

[5] Claim 1 states in part: "[a] method for the delivery and distribution of an electronic solicitation on shareholder issues from an issuer or authorized party to a plurality of authorized shareholders..."

[6] The applicant provided that, "[i]ndependent claims 1, 18, 25, and 34 have been amended to change 'shareholders' to 'authorized shareholders.' Support for this amendment is found at least in paragraph 57..." (D.I. 35, Exh. 13 at 16).

meeting." (D.I. 35, Exh. 13 at 16). It is also apparent that "authorized shareholders" may be selected

based on a range of criteria, i.e., based on the "type" of shareholder they may be:

Claim 1 recites tagging the electronic solicitation message to ensure the electronic
solicitation message is available only to the authorized shareholder of the issuer. This
enables tagging types of shareholders (institutional, individual, mutual funds, hedge
funds) through the position data gathered from brokerage firms which allows the issuer or
authority party (e.g., dissident shareholder) to target specific messages to specific
shareholder types while still protecting the confidentiality of each shareholder.

*Id.* at 17. If only "voters holding positions for the issuer as of the record date" qualify as "authorized

shareholders," there would be no need to speak of various "types" of "authorized shareholders," as there

would only be one type: "voters holding positions for the issuer as of the record date." The specification

further supports this construction: "[n]ext, the Electronic Solicitation System Provider transmits the

message electronically to the recipient group desired by the Sender..." '817 Patent, 7:27-30. The words

"group desired by the Sender" implies that the sender is able to customize the recipient group.

Broadridge's definition is inconsistent with this capability. For all these reasons, the Court does not adopt

Broadridge's limitation of "authorized shareholders" and instead adopts Inveshare's plain and ordinary

meaning construction.

5. "**Tagging**"

| **Inveshare's Proposed Construction** | Plain and ordinary meaning, i.e., labeling; associating one or more characters with a set of data that contain information about the set; using a unit of information as a label or marker. |
|---|---|
| **Broadridge's Proposed Construction** | The act of placing a set of bits or characters that identifies various conditions about data in a file and is often found in the header records of such files. |
| **Court's Construction** | The act of placing a set of bits or characters that identifies various conditions about data in a file. |

The parties dispute the construction of "tagging" as used in claims 1, 18, 25, and 35 of the '817

patent. Inveshare proposes that "tagging" does not require construction, and that if the Court does choose

to construe this term, it should mean "labeling; associating one or more characters with a set of data that

16

contain information about the set; using a unit of information as a label or marker." Broadridge proposes that "tagging" is a technical term and should be construed as "the act of placing a set of bits of characters that identifies various conditions about data in a file and is often found in the header records of such files."

The relevant portion of the claim 1 is: "tagging the electronic solicitation message to ensure the electronic solicitation message is available only to authorized shareholders of the issuer." The claim shows that "tagging" performs a particular technical action within the context of the patent's computer science technology. The parties offered technical dictionary definitions to support their arguments. Inveshare provides three dictionary definitions in support of its construction. The first definition is from *Wiley Electrical and Electronics Engineering Dictionary* (D.I. 42, Exh. 9): "One or more bits or characters which serve to identify data, such as that in a database." Inveshare's second definition is from *McGraw-Hill Dictionary of Scientific and Technical Terms* (D.I. 42, Exh. 10): "[a] unit of information used as a label or marker." Inveshare's third definition is from *IEEE 100* (D.I. 42, Exh. 11): "One or more characters associated with a set of data, containing information about the set."

Broadridge counters with its own dictionary definition from *Computer Desktop Encyclopedia* (D.I. 35, Exh 15): "[a] set of bits or characters that identifies various conditions about data in a file and is often found in the header records of such files." Inveshare's definition from *Wiley Electrical and Electronics Engineering Dictionary* is very similar to Broadridge's definition from *Computer Desktop Encyclopedia*. Inveshare argues, however, that Broadridge's construction incorrectly limits "tagging" to a file, as opposed to "tagging" a message as taught by the specification and claim language. Inveshare cites the preferred embodiment in support of this argument: "[t]he [Electronic System Solicitation Provider] tags solicitation messages with specific parameters to ensure the message is available to the correct voters in logic block." '817 Patent, 6:52-54. Inveshare provides further: "[t]he message tagging module tags each message with issuer and meeting identifiers. This enables only those voters holding positions for the issuer as of the record date to view the electronic solicitation." *Id.* at 7:54-57. Inveshare correctly points

17

out that these embodiments envision "tagging" messages, not files. The specification, however, indicates that the messages are sent via the internet: "[t]he present invention utilizes the Internet (or similar electronic distribution methodology) as a portal for corporate or mutual fund issuers or their dissident shareholders to submit corporate governance solicitation into the system for viewing by investors or their agents." *Id.* at 2:14-19. "When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon Service Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007). Because the '817 patent uses the internet to distribute electronic messages, those messages which are the object of "tagging" are invariably computer files. Inveshare's distinction between "electronic messages" and "files" is thus not significant.

Further, Broadridge's definition is consistent with the specification. The words "identifies various conditions" are consistent with the embodiments disclosing "tagged parameters or identifiers," as parameters work to identify a quality or condition of the message. The Court does, however, remove the latter part of Broadridge's construction stating that the set of bits or characters "[are] often found in the header records of such files." Stating where the set of bits or characters is "often found" is not an actual limitation to "tagging" and is not justified by the specification. For all these reasons, the Court adopts the construction of "tagging" as "the act of placing a set of bits or characters that identifies various conditions about data in a file."

**6. "Validating that Each Shareholder Receiving the Notification is Authorized to View the Solicitation Content"**

| **Inveshare's Proposed Construction** | Validating that each shareholder receiving the notification is authorized to view the solicitation content (plain and ordinary meaning). |
|---|---|
| **Broadridge's Proposed Construction** | Validating that the receiving shareholder is authorized to view the solicitation content after each shareholder receives the notification. |
| **Court's Construction** | Validating that each shareholder receiving the notification is authorized to view the solicitation content. |

18

The parties agree that shareholders receive notification of messages and that the system conducts a validation function to ensure that the shareholder is authorized to actually view the message content. The parties differ, however, over whether these functions must occur in a specific order. Broadridge argues that claim 31 requires the shareholder to receive the message notification before validation of the shareholder's authorization to view the message content. Claim 31 follows:

> The method for the delivery and distribution of an electronic solicitation of claim 25 further comprising the steps of transmitting a notification of the electronic solicitation message to the shareholders and validating that each shareholder receiving the notification is authorized to view the solicitation content.

The Court looks to the claim language to determine if, as a matter of logic or grammar, the claimed actions must be performed in the order written. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003). If not, the Court looks to the rest of the specification to determine whether it directly or implicitly requires such a narrow construction. *Id.*

Broadridge's proposed construction is an incorrectly restrictive reading of the claim language. The fact that "validating" confirms that each shareholder "receiving the notification is authorized to view the solicitation content" does not necessarily mean that the notification has already been transmitted. As stated in *Altiris Inc.*, a claim's listing of steps in a certain order does not require that the steps be strictly performed in that order, unless logic compels otherwise. *Id.* Here, logic does no such thing and arguably supports the opposite order. Common sense supports validating that a message notification is addressed to the right person, i.e., the person authorized to read the underlying message, prior to notifying that person that the message has been delivered. For these reasons, the Court does not interpret the steps of this claim 31 to necessarily occur in the order they are written, and therefore adopts the claim's plain and ordinary meaning.

### 7. "A Component"

| **Inveshare's Proposed Construction** | Plain and ordinary meaning. |
|---|---|

| Broadridge's Proposed Construction | Software module. |
|---|---|
| Court's Construction | Software module. |

The parties dispute the construction of the term "a component." Independent claim 10 offers one example of the term in use:

A processor executing a plurality of components including:

a component for receiving an electronic solicitation message that provides shareholder access to a solicitation content; and

a component for tagging the electronic solicitation message to validate that a shareholder is authorized to view the solicitation content.

The claims further recite "components" for transmitting (claim 12), validating (claim 12), recording (claim 15) and reporting (claim 16). "A component" is not defined by the specification. Broadridge supports its proposed construction of "a component" as a "software module" by citing the following dictionary definition:

One element of a larger system. A hardware component can be a device as small as a transistor or as large as a disk drive as long as it is part of a larger system. Software components are routines or modules within a larger system.

(D.I. 35.3, Exh. 14, *The Computer Desktop Encyclopedia*). Broadridge argues that because the '817 patent is a software patent, the "components" of the patent are all software. Therefore, we should look to Broadridge's dictionary definition that corresponds to software "components." The intrinsic evidence is consistent with Broadridge's argument. The patent at times uses "component" and "module" interchangeably. *See* Figure 5 (referring to "modules" but not to "components"); Patent '817 at 3:23-26 (describing Figure 5 as showing "modules" and "components."). While nothing in the specification explicitly limits "component" to software, there is nothing that suggests it includes anything other than software. For these reasons, the Court construes "a component" as "software module."

**8. A Component for Tagging the Electronic Solicitation Message to Validate that a Shareholder is Authorized to View the Solicitation Content.**

| | |
|---|---|
| **Inveshare's Proposed Construction** | A component for tagging the electronic solicitation message to validate that a shareholder is authorized to view the solicitation content (plain and ordinary meaning). |
| **Broadridge's Proposed Construction** | A software module for tagging the electronic solicitation message and using the tagged electronic solicitation message to validate a shareholder's authorization to view the solicitation content. |
| **Court's Construction** | A software module for tagging the electronic solicitation message to validate that a shareholder is authorized to view the solicitation content. |

Broadridge argues that the "tagging" element of claim 10 is distinct from "tagging" as previously construed. Claim 10's system includes: "a component for tagging the electronic solicitation message to validate that a shareholder is authorized to view the solicitation content." Broadridge argues that "tagging" here performs validation and offers this as distinct from "tagging" as construed in relation to claims 1, 18, 25, and 35. The Federal Circuit presumes that the same claim terms appearing in different claims should be given the same meaning, unless the intrinsic evidence compels otherwise. *Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1087 (Fed. Cir. 2009). Broadridge argues that "tagging the electronic solicitation message to validate" language requires the validation to be part of, and not separate from, the "tagging" process. As Broadridge puts it, "tagging" here should be framed as "tagging to validate" as opposed to general "tagging" used in other claims. To support this contention, Broadridge cites the specification to show that "tagging" and "validation" occur in separate modules:

> The message tagging module 24 tags each message with issuer and meeting identifiers. This enables only those voters holding positions for the issuer as of the record date to view the electronic solicitation. . . . Message presentation module 28 validates the right of the voter to view or listen to the electronic solicitation message.

'817 Patent, 7:54-61. Broadridge argues that the fact that "validation" and "tagging" occur in separate modules signals that "tagging to validate" should be construed separately from "tagging."

Broadridge's insistence that claim 10's "tagging" component must also perform validation is not persuasive. The claim language is not "tagging to validate," as reduced by Broadridge, but "a component for tagging the electronic solicitation message to validate that a

shareholder is authorized to view the solicitation content." While the claim language may be

inelegant, nothing requires the "tagging" component to also perform validation. The claim

language states that the electronic solicitation message is tagged by the "tagging" component but

does not say what performs validation. This understanding is supported by the specification, as

the "message presentation module," not the "tagging module," performs validation. *Id.* Moreover,

the general construction of "tagging" is consistent with this claim, as the message will be

"tagged" with the bits or characters of information that identify shareholders authorized to receive

it. This information will then be validated by the message presentation module. For all these

reasons, the Court declines to construe claim 10's "tagging" as having a distinct construction.

### 9. "Electronic messaging"

| Inveshare's Proposed Construction | Plain and ordinary meaning. |
|---|---|
| Broadridge's Proposed Construction | e-mail |
| Court's Construction | Plain and ordinary meaning. |

The parties dispute the construction of "electronic messaging." Inveshare proposes that

this term is self-explanatory and needs no construction, while Broadridge proposes to limit it to

"e-mail." Limiting "electronic message" to "e-mail," however, is not supported by the intrinsic

evidence. The specification defines "message" broadly as "[a]ny communication from a message

'sender' to a message 'recipient.'" '817 Patent, 4:55-56. Message format is similarly defined

broadly as "[a]ny format other than mail or telephone formats, including video, audio, text,

physical, analog, digital, verbal or any other electronic format as well as any future distribution

format." *Id.* at 4:57-61. This understanding is confirmed by Figures 8, 9, and 10, which disclose

"message boards" as an avenue for message distribution. Limiting "electronic messages" to e-

mail would remove these embodiments from the patent. Broadridge's construction elevates

22

extrinsic dictionary definitions above the intrinsic evidence of the specification, conflicting with

an essential holding of *Phillips*, 415 F.3d at 1320-21. For these reasons, the Court construes

"electronic messaging" as having its plain and ordinary meaning.

The Court will construe the terms as set forth above.